1  Kendra Pearsall

2  14501 County Rd. 3

3  Longmont, CO 80504

4  Telephone:  970-673-7484

   Email:  drpearsall@gmail.com

5

6

7            **UNITED STATES BANKRUPTCY COURT**

8          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9                  **(SANTA ANA DIVISION)**

10 In Re:                          )  Chapter 11 Case No. 8:14-11492-ES
                                   )
11 THE TULVING COMPANY, INC.,      )  DECLARATION OF KENDRA PEARSALL
                                   )
12              Debtor             )  IN OPPOSITION TO THE CHAPTER 11
                                   )
13                                 )  TRUSTEE'S MOTION TO APPROVE
                                   )
14                                 )  SETTLEMENT AGREEMENT DOCKET 724
                                   )
15                                 )  ON 12/14/2017.
                                   )
16                                 )

17

18

19

20

21

22

23

24

25

26

27

28

1   I, Kendra Pearsall, declare as follows:

2       1.      I am Tulving creditor who is filing this Object on behalf of myself and 60 Tulving

3   creditors who have signed a letter that we oppose the proposed **SETTLEMENT**

4   **AGREEMENT DOCKET 724** that will go before the judge on 12/14/2017.

    I have reviewed Trustee Weneta M. A. Kosmala's proposed <u>Settlement Agreement</u> with the

5   Gugasians, which would let them pay $648,250 to settle the $2.1M lawsuit against them.

6   2. We disagree with the settlement for the following <u>three</u> reasons:

7

8       <u>First reason to object</u>, Ms. Kosmala believes that the Settlement Agreement she

9   signed *would not generate any cash distributions to creditors* but the creditors are the

10  victims that deserve compensation.

11

12  The cash that the estate has, and the money paid pursuant to the Settlement Agreement,

    would all go to the professionals (about $1.2M). She believes that this outcome (compared
13
    to bringing this to trial) is in the best interests of the creditors.
14
    How is it that all the money from the settlement going to attorneys that bill at $900/hour
15
    benefits the creditors who have lost their entire life savings as a result of the Tulving fraud?
16

17  We have received 18% of our losses in error coins which can only be sold for 17% of what

18  we are told they are worth which gives us a total payout of about 3% of what was stolen

19  from us. We deserve far more than 3%. We do not agree with Ms. Kosmala when she states

20  that all of the settlement money going to the professionals and none to the creditor victims

21  is in our best interests. This settlement only benefits the attorneys.

22
    On the other hand, if the Settlement Agreement is not approved, and the Gugasian lawsuit
23
    were to go to trial, the trial has the potential of bringing in an additional $1.5M or so, most
24
    of which could and rightfully should go to the creditors.

25      The following is a true and correct email that I received from another co-creditor,

26  Jerry Harpster: *"Here is*  the email I got from Great Collections regarding trying to sell the

27  error coins. We were distributed error coins "valued" at **$22,872**. The email from Great

28  Collections stating they're worth about $4,000 is below. "

LAW OFF

1

1  Math: 4,000/22.872 = .17  *(.18 payout x .17 value = .03 or 3% recovery from what Tulving*
2  *owes)*

3

4  ---------- Forwarded message ----------

From: "Ian Russell" <ian@greatcollections.com>

5  Date: Nov 3, 2017 12:07 PM

6  Subject: Error Coins - GreatCollections

7  To: <eutectica@peaksky.com>

8  Cc:

9
10  Dear Jerry,

11
12  Thank you for your e-mail and listing of the error coins.  In today's
market, these coins are worth about $4,000-$5,000.

13

14  To consign to our auctions, please use the attached consignment form.

15  I've also attached our consignment instructions.

16
17  They are not something we would purchase outright, since the price
guide values are so high - we prefer to auction them for clients so

18  there is no confusion as to pricing.

19

20  Sincerely,

21
22  - Ian

23
24  Ian Russell, President

GreatCollections

25  Certified Coin Auctions & Direct Sales

26  Tel:  1.800.44.COINS (+1.949.679.4180)

27  E-mail:  ian@greatcollections.com

28  Website:  www.greatcollections.com

1    <u>Second Reason to Object:</u>, **There is a very good chance of winning if it goes to trial**

2    **so why settle?**

3    The <u>Motion</u> for an order approving the Settlement Agreement points out that a court

4    should consider 4 factors to determine the fairness, reasonableness, and adequacy of a

     proposed settlement agreement (the "Woodson Factors"). Those 4 factors are: [1] *the*

5    *probability of success in litigation*, [2] *the difficulties, if any, to be encountered in the matter*

6    *of collection*, [3] *the complexity of the litigation involved and the expense, inconvenience and*

7    *delay necessarily attending it*, and [4] *the paramount interest of the creditors and the proper*

8    *deference to their reasonable views in the premises*.

9

10   For #1, Ms. Kosmala states that she believes that "the Estate has viable claims

11   against the Gugasians and there is a good likelihood of success." <u>Presumably, this factor</u>

12   <u>favors a trial.</u>

13   For #2, Ms. Kosmala states that she "is not aware of any facts to indicate the

14   uncollectibility of judgment(s) obtained", but does point out that the Gugasians would

15   likely appeal any judgment(s), which would increase the costs of litigation and delay any

16   recovery. <u>This factor would seem to favor a trial as well.</u>

17   For #3, Ms. Kosmala states that there may be complex forensic accounting issues

18   (determining when The Tulving Company was insolvent), and that there would need to be

19   significant additional discovery. She points out that a trial would incur large costs (she

20   estimates $100K-$200K; the Gugasians believe it would be $200K-$300K), and that it

21   would delay the closing of the Estate (especially if a judgment is appealed). My

22   understanding is that the large costs would be borne by either the Gugasians or the

23   bankruptcy professionals (depending on the outcome). We feel the Return on investment

24   will justify the costs.

25   For #4, Ms. Kosmala points out that settling will allow final partial distributions for

26   non-administrative claims (the professionals), and points out that the creditors received

27   (or opted out of receiving) coins "valued at approximately 18.75% of their claims."

     To this we say the following:

28   1. The error coins we received worth "18.75% of the claim" in actuality can only be sold for

LAW OFF

20% of what it supposedly is worth which brings our claim down to about 3% of the money we lost to Tulving.

2. We would much prefer the potential of a cash distribution than receiving some coins that are hard to sell.

3. The attorneys and professionals in this bankruptcy have been billing at very high rates such as 900-$1200/hr. which we feel is outrageous. The professional fees have eaten up most of the money that could have been given to the victims of this crime. If we have to settle for a recovery of only 3% on our investment, we feel that the Trustee should see if the current attorneys (or new attorneys) are willing to take this case on a 30% contingency **since there is a good chance of winning** the $2.1 million settlement and the creditors would get the remaining 70%. The professionals will still receive a very high amount of funds, far more than the creditors, some of who lost their life savings.

4. ESt. FEES/EXPENSES:

| Professional | 3/2014 through 1/2015 | 2/2015 through 10/2016 | Total | Paid | Owed | Notes |
|---|---|---|---|---|---|---|
| BRG | $200,203.19 | $418,403.44 | $618,606.63 | $32,864 | $585,742.63 | BRG was authorized to be paid $86,470.05, but received $32,864 (per docket 637). |
| PSZ&J | $245,394.31 | $498,208.05 | $743,602.36 | $107,763.54 | $635,838.82 | |
| R. Todd Neilson | $97,347.39 | None | $97,347.39 | $2,802.14 | $94,545.25 | |
| Total | $542,944. | $916,611. | $1,459,556. | $143,429. | **$1,316,126** | |

89          49          38          68          **.70**

5. <u>Third Reason to Object</u>: If the Court approves the Settlement Agreement, it will likely leave many questions unanswered, that we creditors may wish to know.

We want to know the truth about what happened at The Tulving Company that caused all of us to suffer such tragic financial losses. The amount of the Settlement Agreement is less than the amount that the Gugasians apparently received just from the "Home Office" lease, which appears to be an altered photocopy of the signed apartment lease (e.g. not even signed by The Tulving Company), and an apartment that the Gugasian's associates lived in and apparently not used by The Tulving Company, therefore the Gugasians will get away with a profit on their fraudulent scheme.

Questions that need to be answered:

- Was the 2006 <u>Home Office lease</u> forged? If not, what explains it being identical to the 2006 <u>Residential lease</u>, except "2110 1/2" (street address) changed to "2112 1/2" and Levon's initials added?

- Was the Home Office lease (that the Gugasians apparently got over $800K for) ever used by The Tulving Company? If so, for what purpose?

- How were the $12,500/mo 2006 residential leases fair market value? It appears that one was offered for $5,500/mo, the other for $1,850/mo, after the bankruptcy filing.

- Why were both the 2006 leases for exactly the same rent, whereas later the rents were different?

- Why were the 2006 leases made in the name "Tulving Corporation" -- a company name that never existed?

- Why was there a "For Lease" sign at the unused building (16th Street) in October, 2011, in the middle of rent/expenses?

LAW OFF

- Why was rent being paid for the 16th Street building before The Tulving Company would be able to use it?

- What does the 2011 agreement state?

- Were the Gugasians partners of The Tulving Company per the 2011 agreement?

- Was David Seyller, the person who signed the 2011 leases, authorized to sign leases?

- Why does it look like David Seyller's signature and initials were placed over someone else's, for all 3 2011 leases?

- The 2011 office lease, effective January 1, 2011, was for $30,000/mo. How come a rent payment of $12,000 was made on January 3, then payments of $17,800 and $29,800 on February 1?

- How come the rent payment for the office went up 6% on October 12, 2011 ($30,000 to $31,800), when a rent increase wasn't due for another few months, and should have been raised just $1,000/mo?

- What was a plausible reason for reallocating the rents? The IRS scam theory doesn't hold water.

- Is the Court aware that the actual value of the error coins that creditors received is approximately 3% of what they are owed (compared to 18.75% that Ms. Kosmala keeps mentioning to the Court)?

The vast majority of the facts stated by Ms. Kosmala appear to be true (such as the background of the case). So I will focus on the ones we see as concerning.

LAW OFF

First, she states on page 7 line 16 that all 3 leases (office, apartment, home office) were "upon information and belief at fair market rates." **This is False**. The apartment lease started in 2006 at $12,500/month plus tax/insurance (with a $25,000 security deposit). Yet somehow in 2015, it was being listed (partially furnished and newly upgraded) at just $5,500/mo (with a $5,500 deposit). The "home office" lease was similar, being leased to The Tulving Company in 2006 for $12,500/month but being offered in 2016 for $1,850/mo. How in the world could $12,500 in 2006 have been market rate if the apartment was then offered it for $1,850 in 2016? The office lease of $12,000 in 2008 appears to me to have been roughly market value at the time, but how could it have been fair market value if the rent of $33K in 2014 was fair (per Levon's statement), and it was then offered in 2015 for $10K?

Second, Ms. Kosmala also states that Hannes Tulving was able to reduce his recognized income by $200,000 in 2011 as a result of the "reallocated rents". That opens a can of worms: the original rent was heavily inflated (so it likely should NOT have been recognized as income), and half of the $200,000 amount comes from the "home office" that Hannes Tulving was apparently not using at all (and should therefore not have to be reported as income). So it appears that the "reallocated rents" reduced Hannes Tulving's income to what it *should* have been reported as.

**Ms. Kosmala knew last year that the apartment she believes had a fair market value of $12,500/mo in 2006 was on the market for $1,850 last year**. She was also aware that the 2006 leases had identical rents (despite being apartments with very different values), and that the reason for the identical rents was that one of the leases appears to be an altered photocopy of the other (and if true, presumably forged). She also knew that the the Santaniellos (associates of the Gugasians) lived in the "home office" for years, making it dubious that The Tulving Company could have benefited from the apartment.

LAW OFF

6. We feel that there are other upsetting factors, such as the Trustee considered $12,500 to be "market rent" for an apartment that was offered for $1,850 a decade later), and we are concerned the settlement is not fair (from what is known, it appears that the Gugasians received about $875,000 in rent just from the apartment that The Tulving Company apparently never used and did not even sign a lease for).

7. In summary, we creditors urge your Honor to consider our objection to the Settlement due to the fact that the likelihood of a judgment is in our favor if it goes to court which will give the creditors an increased chance at a higher recovery than the tiny 3% we've received and to allow the truth to come forth about the Gugasian possible fraudulent involvement with the Tulving Company that caused its demise.

8. See Attachment A for a list of the 60 creditors who support this Opposition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 4th day of December 2017 at Longmont, CO.

_____

Dr. Kendra Pearsall

LAW OFF

Attachment A

Names of Tulving Creditors who requested that their names be listed in the opposition to the settlement agreement along with their comments:

1. Kendra Pearsall
2. Thomas E. Ferg
3. Rick Leffel
4. P. Andrew Logan
5. William Graef
6. Richard I. Karpay
7. Scott Ziemke
8. Kenneth D. Porad
9. John Wires
10. Rick Anderson
11. John Misja
12. Benjamin J. Grunwald
13. Donna Taubenslag
14. Robert J. Chevako
15. Radovan Rusimovic
16. Jerry Harpster
17. Scott Daudert
18. Arnold Glenn
19. Ken Slpes
20. Richard Zorthian
21. William G. Swigert
22. William Cosby
23. Peter H McCandless
47. Ramachandra Paidi
48. Douglas Fairclough
49. Nellie Barnes
50. Jesse E Smith, MD
51. Laszlo Szabo
52. Stan Debro
53. Bruce Fox
54. Richard & Sharon Kirby

24. Terry E. Kinnamon
25. Jennifer Reedy
26. Garry N Willit
27. Winton L. Weeber
28. Walter Jaworski
29. Andrew Carl
30. Randolph C. Gill
31. Ralph A. Weidler
32. Tom Minasian
33. Fred Kodesch M.D.
34. Bill Cicia
35. William P. Bengen
36. Friedhelm Ilse
37. Betty Harris
38. Peter Stetson
39. A.Gordon Reynolds
40. Heidi Weingart
41. William M Williams
42. Fred Teal
43. Fred M Dycus
44. Amarjit Bahl
45. Eric Simonson
46. Rick McKinniss
55. Susan and Lawrence Thompson
56. Yevgeniy Timoshenko
57. Laszlo Szabo
58. Geoffrey M Hertel
59. Charles Moseley
60. Charles M. Hobbs

**Comments from Creditors:**

I am not happy with any of the outcome thus far. The coins that I received are pretty much worthless as well pennies on the dollar at best. It seems the lawyers get all the money and leave us with nothing. Not fair justice at all!

John Misja

My sense is justice is not being served. Our system rewards those who work the system(read trustee attorney & Judge) and frankly I'm sick and tired of being presumed upon as one to pay their salary. --Rick Anderson

As jewelers, over the course of our careers we bought gold coins because of their intrinsic value. We shipped $122,000 of gold coins to Tulving Company, who promised a check within 5 days.

The gouging legal fees, the lack of effort to recover monies for creditors, the giving away of private customer data from The Tulving Company to Great Collections, the continued misrepresentation of the value of the error coins, and now the effort to simply settle the Gugasian debacle begs to question how much more theft can occur in this case at the expense of creditors? We beg the court to review legal fees charged us. We ask the court to reiterate to the Trustee the importance and duty of informing creditors of ongoing efforts on our behalf.

We also beg the court to disavow this settlement with Gugasians. If creditors are to receive absolutely nothing with a settlement, it is therefore prudent to proceed with trial.

Jerry Harpster


Our legal system was created to protect the innocent. With this settlement, the innocent will have been ignored and the criminals rewarded. How are we to believe in a system that directly contradicts what it stands for? I agree at it is imperative that this proceed to trial, with lawyers that take it on a contingency so that we, the creditors, may recover something more than mere insults.

Heidi Weingart


It appears that the creditors will receive a negligible amount, while the remaining funds in the proposed settlement are sluiced into the hands of very well-paid attorneys. I have no expectation of "perfect justice", but the terms of the proposed settlement are typical of what is too often a self-serving legal system. This settlement proposal should be rejected.

William Williams

i tried to buy 25 thousand dollars worth of bullion coins, and got robbed.  why is this so complicated to litigate? disapprove the settlement. sue and distribute the proceeds fairly.

eric simonson